Argued and submitted February 17, affirmed May 4, 2011

WASHINGTON MUTUAL BANK,
*Plaintiff,*

*and*

JP MORGAN CHASE BANK,
a national association,
*Plaintiff-Respondent,*

*v.*

Kurt E. FREITAG
and Rita H. Schaefer,
*Defendants-Appellants,*

*and*

LINCOLN COUNTY, et al,
*Defendants.*

Lincoln County Circuit Court
070387, 070388;
A142630 (Control), A142631

259 P3d 1

John E. Pollino argued the cause for appellants. With him on the briefs was Garrett Hemann Robertson P.C.

Robert C. Dougherty argued the cause and filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiff Washington Mutual Bank[1] filed these consolidated actions to foreclose on trust deeds to two coastal properties owned by defendants. In response, defendants asserted affirmative defenses and counterclaims based on the bank's alleged breach of contract, breach of fiduciary duty, and violation of various federal statutes. The trial court granted the bank's motion for summary judgment as to all but one issue—a factual dispute concerning credits for hazard insurance charges that were applied to the balance on the loans; after a bench trial, the court ruled in the bank's favor on that issue as well. The court then entered a judgment foreclosing on the trust deeds and a supplemental judgment awarding attorney fees. Defendants appeal both judgments. We affirm.

Defendants' first assignment of error concerns the trial court's grant of Washington Mutual's motion for summary judgment. We state the facts pertaining to that assignment in the light most favorable to defendants, giving them the benefit of all reasonable inferences that can be drawn from those facts. *Bergmann v. Hutton*, 337 Or 596, 599, 101 P3d 353 (2004).

In the summer of 1997, defendants applied for loans from Washington Mutual to construct single family homes on two adjoining lots in Newport, Oregon. Defendants filled out "Master Loan Applications" and "Uniform Residential Loan Applications" on which they checked boxes stating that the properties would be "investment" as opposed to "primary residence" or "secondary residence." Defendants listed five real estate holdings: a residence in Illinois; a residence in Arizona; rental property at "6855 Gladys"; and the two lots in Newport. Washington Mutual approved the applications and issued loan commitment letters.

Defendants subsequently entered into loan agreements with the bank for construction and permanent financing, subject to the conditions set out in the loan commitment

---

[1] During the course of the proceedings, JP Morgan Chase Bank was substituted as plaintiff. We refer to plaintiff as "Washington Mutual" or "the bank" for purposes of this opinion.

letters. Defendants signed promissory notes for the loans, one in the amount of $291,650 and another in the amount of $269,800, and the loans were each secured by separate deeds of trust. As relevant to this assignment of error, paragraph 6 of the trust deeds provided, in part, that

> "Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing * * *."

At the same time, however, defendants executed various "riders" to the trust deeds. One of those riders, the "1-4 Family Rider," eliminated the standard obligation to occupy the property as a primary residence. The 1-4 Family Rider provided, "Unless Lender and Borrower otherwise agree in writing, the first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted."[2] The rider also assigned to Washington Mutual all rents from the property, but provided that defendants would receive any such rents so long as they were not in default on the loan.

Construction on the homes was completed in late 1998. At the conclusion of construction, a dispute arose between defendants and the bank regarding the last $10,000 in loan proceeds. Under the terms of the construction loans and accompanying documents,[3] all loan proceeds—with the exception of the final disbursement—were to be disbursed by checks made payable to defendants' general contractor. The last disbursement under both loans, however, was to be made by check "payable to all parties."

Upon receiving a final certificate of completion of construction for the homes, Washington Mutual issued two final checks, each in the amount of $5,000, that, pursuant to the parties' agreement, were made payable jointly to defendants and their contractor. As it turned out, the contractor

---

[2] That provision of the 1-4 Family Rider also negated the effect of a provision in the Construction Term Rider to Deed of Trust that modified Uniform Covenant 6 by establishing the date the occupancy obligation would commence.

[3] Defendants executed "Optional Document-Draw Payee Appointments" that directed Washington Mutual to make payments to defendants' general contractor.

negotiated the checks at the Bank of Newport without first obtaining defendants' endorsement. Defendants then objected to payment of the checks, and the disbursements were eventually credited back to the loan accounts. Nonetheless, the payment mishap spawned a protracted dispute between defendants and Washington Mutual regarding interest, adjustments, and payments due on the loans.

During the course of the parties' dispute, no later than in 2000, defendants stopped making loan payments. As a result, Washington Mutual filed these actions to foreclose on the trust deeds. In their answer, defendants denied that the bank was entitled to foreclose on the trust deeds and asserted affirmative defenses and counterclaims. Defendants' affirmative defenses and counterclaims were based, in part, on allegations that Washington Mutual had violated the Truth in Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA) by improperly disbursing the final payments and by "force-placing insurance" on the properties— *i.e.*, by obtaining insurance coverage for the properties and then charging defendants for the premiums. Defendants further argued that, in addition to violating federal law, the improper disbursements and force-placing of insurance were material breaches of the loan agreements that excused defendants' performance of those agreements.

Washington Mutual moved for summary judgment on all claims and defenses, arguing that defendants had indisputably defaulted on their loan obligations and that, because the loans were made for investment purposes (as defendants represented in the loan applications), neither TILA nor RESPA applied. The bank further argued that, even if TILA and RESPA applied to the loans, any defenses or claims for recoupment based on those laws were untimely. Finally, the bank argued that defendants were unable to present any evidence that the bank had materially breached the loan agreements.

In an affidavit submitted in opposition to the bank's motion, defendant Kurt Freitag averred, among other things:

> "As required by the provision of the Deed of Trust which [defendant] Rita Schaefer and I executed which incorporates the Adjustable Rate Riders, and 1-4 Family Rider

Assignment of Rents, we were required to reside in the premises within sixty days of the completion of construction. My wife and I have used one or the other of the premises as a secondary personal residence 15-20% of each calendar year since completion of the construction of the property in late 1998, representing between 55 and 75 days residence each year at one or the other of the premises. The remainder of the time available, we rent the premises as vacation rentals."

Based on that affidavit, as well as the occupancy provision of the deeds of trust and the riders thereto, defendants argued that the "extension of credit for a personal residence which is also an investment specifically makes the requirements and provisions of the Truth in Lending Act and RESPA applicable to this transaction."

The trial court agreed with the bank.[4] It ruled that the loans were made for business purposes and that TILA and RESPA were therefore inapplicable; for that reason, the court did not reach the timeliness or merits of any alleged TILA and RESPA violations. The court also concluded that defendants had not established, and the bank had not breached, any fiduciary duty owed to them, a ruling that defendants do not challenge on appeal, and, further, that the bank had not breached the terms of the parties' agreements. Except as to one issue, the trial court granted the motion for summary judgment.[5]

On appeal, defendants contend that the trial court's grant of summary judgment was erroneous for two reasons. First, defendants contend that there are genuine issues of fact regarding their affirmative defenses and counterclaims based on TILA and RESPA violations, including (1) whether the loans were for business or consumer purposes, which determines whether those laws apply; (2) whether the bank indeed violated TILA and RESPA; and (3) whether recoupment claims based on TILA and RESPA are time barred. Second, and alternatively, defendants argue that, even if their

---

[4] The Honorable Robert J. Huckleberry heard the motion and issued a letter opinion.

[5] On one issue—defendants' entitlement to a credit involving the "force-placed" insurance—the bank conceded that there were issues of fact that required a trial. That issue was eventually tried to the court, as discussed later in this opinion.

TILA and RESPA defenses and counterclaims fail, there is a question of fact as to whether the bank nevertheless materially breached its obligations under the loan agreements, thereby excusing defendants' performance.

■　　We begin with defendants' contention that their affirmative defenses and counterclaims based on TILA and RESPA should have survived summary judgment. Those federal laws protect consumers in the context of credit transactions. *See* 15 USC § 1602(h) ("The adjective 'consumer', used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are *primarily for personal, family, or household purposes*."). Conversely, TILA and RESPA do not apply to extensions of credit made primarily for business or commercial purposes. *See* 15 USC § 1603(1) (TILA protections do not apply to "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations"); 12 USC § 2606(a)(1) (protections in RESPA do "not apply to credit transactions involving extensions of credit * * * primarily for business, commercial, or agricultural purposes"); 12 USC § 2606(b) (exemptions in TILA and RESPA are intended to be the same); *Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F3d 401, 417-19 (9th Cir 2011) (describing overlap between TILA and RESPA exemptions).

The trial court ruled that the loans were made to improve investment properties and were therefore "primarily for business" rather than personal purposes. The thrust of defendants' argument on appeal is that the trial court applied a truncated and overly simple test to determine whether the loans were for business purposes. According to defendants, loans for rental properties are not necessarily for a business purpose. The analysis, defendants submit, is more involved; the court should have traced through Regulation Z, the Federal Reserve Bank's implementation of TILA.

Regulation Z—more accurately, an official staff interpretation of that regulation—states that "credit extended to acquire, improve, or maintain rental property

(regardless of the number of housing units) that is non owner-occupied is deemed to be for business purposes * * *." 12 CFR Pt 226, Supp I, Subpart A, Section 226.3. The staff interpretation continues,

> "[I]f the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner occupied and this special rule will not apply. *For example, a beach house that the owner will occupy for a month in the coming summer and rent out the rest of the year is owner occupied and is not governed by this special rule.*"

*Id.* (emphasis added).

In the case of owner-occupied rental property, the staff interpretation sets out five factors that should be weighed to determine whether rental property is for business rather than personal purposes:

"• The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

"• The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.

"• The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.

"• The size of the transaction. The larger the transaction, the more likely it is to be business purpose.

"• The borrower's statement of purpose for the loan."

*Id.* Federal courts have looked to those five factors to determine whether credit is for a personal or business purpose. *See, e.g., Thorns v. Sundance Properties*, 726 F2d 1417, 1419 (9th Cir 1984) (holding that five factors should be applied to determine whether loan for investment in partnership was for personal or business purposes).

Defendants contend that, "[i]f the trial court had considered the official interpretation of the applicable regulations, material questions of fact would have resulted making its grant of summary judgment wrong." There are multiple problems with that argument. We have no reason to believe that the trial court failed to consider the five factors; although the court's letter opinion does not say one way or another whether the court considered commentary to Regulation Z in reaching its conclusion, the factors were discussed at the summary judgment hearing. More important, though, commentary to Regulation Z does not change the fact that defendants failed to present any evidence that the loans were primarily for a "personal" rather than business purpose.

The undisputed evidence at the summary judgment stage established that defendants intended to construct two beach rentals on adjoining lots; in seeking loans from Washington Mutual, defendants specifically represented that the loans were not for a primary or secondary residence, but rather for "investment." The loan application further indicated that, in addition to their two residences (in Illinois and Arizona), defendants would then own three rental properties—the two beach homes and a rental at "6855 Gladys." As part of their loan agreements, defendants also executed riders that contemplated that defendants would be renting the beach homes and explicitly eliminated defendants' obligation to reside in the homes.[6]

Defendants, for their part, presented no evidence to contradict the representations made in their loan applications regarding the "investment" nature of the loans. Defendants submitted an affidavit stating that they have "used one or the other of the premises as a secondary personal residence 15-20% of each calendar year since completion of the construction of the property in late 1998" and have rented the

---

[6] Defendant Freitag's affidavit states that defendants were required to "reside in the premises within sixty days of the completion of construction" pursuant to "the provisions of the Deed of Trust * * * [and] the Adjustable Rate Riders, and 1-4 Family Rider Assignment of Rents." It is not clear whether defendants argue on appeal that the deeds of trust and riders required them to occupy the premises. Rather than belabor the point, we simply note that such a reading of those documents is wholly implausible; to the contrary, the 1-4 Family Riders unambiguously eliminate any occupancy requirement from the deeds of trust.

premises as vacation rentals the remainder of the time. The fact that defendants subsequently occupied "one or the other" of the rental homes for part of each year does not demonstrate that the loans were made for purposes other than investment; indeed, it says little, if anything, about the purpose of the loan *at the time that credit was extended*, and it does nothing to contradict defendants' express statement in the loan applications that the properties were for "investment." *See Stillman v. First Nat. Bank of North Idaho*, 117 Idaho 642, 645, 791 P2d 23, 28 (Idaho Ct App 1990) (only "workable approach, in light of the scheme established by Congress," is to characterize the purpose of a loan at the "outset of the transaction, and to maintain this characterization throughout the life of the loan"; TILA does not impose upon lenders an "affirmative duty to ascertain what happens to money after it is disbursed").

Moreover, even under the Official Commentary to Regulation Z, the fact that rental property is intended to be "owner occupied" simply takes the loans out of the *special rule* that treats credit for rental property as having a business purpose and puts them under the more general five-factor test. Defendants, although ostensibly relying on those factors, have not presented any evidence regarding the factors, let alone evidence that would outweigh their own "borrower's statement of purpose for the loan"—that is, their representation that the loans were for "investment" properties. *See Mauro v. Countrywide Home Loans, Inc.*, 727 F Supp 2d 145, 156 n 10 (EDNY 2010) (plaintiff borrower could not survive summary judgment on TILA claims where she "obtained the loans for investment purposes, used investment rental property as security for the loans, and has failed to point to any evidence to show that the loans were obtained for personal purposes"); *Goff v. Utah Funding Commercial, Inc.*, 2009 WL 4665800 at *3 (D Utah 2009) (borrower "was unable to provide any competent evidence that the [loan] proceeds were used for personal, family, or household purposes in order to establish an issue of fact. Therefore, the court concludes that the loan was for commercial purposes and not subject to TILA."); *cf. Galindo v. Financo Fin., Inc.*, 2008 WL 4452344 at *4 (ND Cal 2008) ("[Borrower] contends that there is no way to tell whether or not the loan was made for a

business or personal purpose because she has not alleged any facts one way or the other in the complaint. That much is true. Without any such allegations detailing the purposes of the loans, [borrower] has stated no claim. Her TILA claim is therefore dismissed."). On this record, we agree with the trial court's conclusion that defendants' evidence fails to create a genuine issue of fact as to whether the construction loans were primarily for personal rather than business purposes.

Having concluded that TILA and RESPA are inapplicable, we turn to defendants' alternative contention that their performance of the loan agreements was excused by Washington Mutual's material breaches of those agreements. According to defendants,

> "[t]he record shows defendants' obligation to pay on the notes was excused because in addition to violating various TILA and RESPA provisions, plaintiff effectively barred defendants from curing the delinquency as a result of its inability to accurately state the principal and interest owing, its failure to allow defendants to cure the alleged breach in 1999, its failure to credit a $45,000 payment that would have cured the delinquency, and its refusal to accept any additional payments."

A discussion of defendants' allegations and the record of correspondence between the parties and other evidence would not benefit the bench, bar, or public. Suffice it to say that the summary judgment record, viewed in the light most favorable to defendants, does not demonstrate genuine issues for trial as to a material breach of the loan agreements that would have excused defendants' performance of their payment obligations. For that reason and the others stated above, we affirm as to the trial court's grant of Washington Mutual's motion for summary judgment.

■ In their second assignment of error, defendants argue that the trial court erred "in not ruling on defendants' motion to file a supplemental answer." That motion, which sought leave to add counterclaims based on unlawful debt collection practices, was filed while discovery motions and the bank's motion for summary judgment were pending. At the summary judgment hearing, Washington Mutual's counsel stated, "Well, the only one [of those motions] that I think

is ripe for hearing today, although I'm certainly willing to discuss the other motions, is the motion for summary judgment." Defendants' counsel, who had just recently received the bank's memorandum opposing defendants' proposed pleading amendments, likewise stated that "the only thing that's ripe is the motion for summary judgment." The trial court later granted the motion for summary judgment in a letter opinion, leaving for trial only a factual issue as to whether defendants had provided proof of insurance on the property, thereby entitling them to a credit on the escrow balance for premiums that defendants paid for "force-placed" insurance.

The trial court never held a hearing on the motion to file a supplemental answer or expressly ruled on the motion. Defendants posit "that the trial court considered defendants' motion moot because of its ruling on [the bank's] summary judgment motion[.]" In fact, the parties proceeded to trial on a limited factual issue 11 months after the summary judgment motion was granted, and the court subsequently entered a general judgment, all without objection by defendants regarding the pleadings. Defendants never sought a hearing or informed the trial court that it had failed to rule on the motion to file a supplemental answer, *see* UTCR 2.030, despite having considerable opportunity to bring that matter to the court's attention after the summary judgment hearing, including two case status conferences with the court. If, as defendants now contend, the trial court erroneously failed to rule on the motion to supplement their answer, they were obligated to bring that matter to the court's attention in a timely manner. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) ("Preservation gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal."). We therefore reject defendants' second assignment of error.

In their third assignment of error, defendants contend that the trial court erred in excluding a number of exhibits that they proffered at trial. As explained above, the trial court's summary judgment ruling left a single issue for trial: Whether defendants were entitled to credits for hazard insurance premiums that Washington Mutual paid and then

included as part of defendants' debt. That particular dispute arose out of provisions in the deeds of trust that required defendants to obtain hazard insurance; in the event that defendants failed to maintain the insurance, the bank was authorized to obtain coverage and add that cost to defendants' debt.

In 2000, the bank concluded that defendants' properties were not adequately insured and began purchasing "force-placed" insurance on the two properties, the cost of which they passed along to defendants as part of the loan balances. In their defenses and counterclaims, defendants contended that the bank was mistaken in purchasing that insurance and charging defendants for the premiums. At the summary judgment stage, defendants submitted an affidavit from defendant Freitag in which he averred, "I have maintained insurance policies covering the casualty fire loss to the premises continuously since executing the Deeds of Trust and related documents in 1998 * * *." He further averred that he provided Washington Mutual with notice of those policies. The affidavit created genuine issues of material fact regarding the force-placed insurance, and the parties proceeded to trial on that limited aspect of defendants' defenses and counterclaims.

At trial—which, again, took place nearly a year after the motion for summary judgment was granted—defendants attempted to offer various documents evidencing insurance policies covering the properties. Those documents had not been produced to the bank previously, despite the bank's discovery request for "[a]ny and all documents relating to, referring to, or evidencing any insurance on the properties, including but not limited to applications, policies, declaration pages, premium statements, cancellation notices, payments, loss claims, and correspondence." Defendants' response to the bank's request, served on the bank 15 months before trial, was to produce certain specified documents, and to note that "[a]dditional documents to the extent that they exist will be provided upon receipt." For that reason, the bank moved "to exclude Defendants' Exhibits 101 through 110 as they were not provided in discovery."

The trial court granted the motion and excluded the documents. The court explained the basis for its ruling:

> "THE COURT:   * * * [T]he issue was framed after the summary judgment motion—the sole issue, and again whether or not the scope of it, at least everyone became very aware that this was the central issue in this trial, was going to be the hazard insurance.
>
> "And the policies, if your client was in possession of letters or other document—documents having to do with evidence—hazard insurance coverage for those periods of time that are the issue in this litigation, why would those have not been provided pursuant to a production—a request for production? I don't get that part as to how that would be perhaps overlooked or why we're just producing them on the eve of trial, if you will, * * * not having previously been provided as any part of discovery?
>
> "This is also a case, I will also note for the records, [that] has gone through settlement conferences and otherwise where this was again the central issue.
>
> "And your clients' choice to make those documents available to you, [defendants' counsel], at such late date, if you will, there's consequences of those choices, and right now, again I take it from your—your comments here are that Exhibits 101 through 110, [counsel], were not previously submitted to [the bank] in response to their request for production[?]
>
> "[DEFENDANTS' COUNSEL]:   That's correct, Your Honor.
>
> "THE COURT:   For that reason I'm going to deny their introduction at this time into evidence."

The parties proceeded to trial without Exhibits 101 through 110, and the court ultimately ruled in favor of the bank.

On appeal, defendants contend that the court erred in excluding those exhibits because Washington Mutual never obtained a court order compelling their production. According to defendants, ORCP 46 B, which governs discovery sanctions, requires that a party violate a court order before any sanctions are imposed. ORCP 46 B provides, in part:

> "If a party * * * *fails to obey an order to provide or permit discovery*, including an order made under section A of this rule or Rule 44, the court in which the action is pending may make such orders in regard to the failure as are just, including among others, the following:

> "* * * * *

> "B(2)(b)  An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the disobedient party from introducing designated matters in evidence[.]"

(Emphasis added.) "Under the rule," defendants argue, "there must be an order of which the party has notice and which has been violated before sanctions may be imposed against the offending party."

■      Defendants' argument is correct as far as it goes: ORCP 46 B authorizes sanctions for violations of court orders. Defendants, however, ignore ORCP 46 D, the section of the rule that is applicable here:

> "If a party * * * fails (1) to appear before the officer who is to take the deposition of that party or person, after being served with a proper notice, *or (2) to comply with or serve objections to a request for production and inspection submitted under Rule 43, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, including among others it may take any action authorized under subsection B(2)(a), (b), and (c) of this rule.*"

(Emphasis added.) Defendants' observations regarding ORCP 46 B notwithstanding, ORCP 46 D expressly authorizes an ORCP 46 B(2)(b) sanction—"prohibiting the disobedient party from introducing designated matters in evidence"—when a party has failed to "comply with * * * a request for production and inspection submitted under Rule 43[.]" *See, e.g., Jones v. Dorsey*, 193 Or App 688, 691, 91 P3d 762, *rev den*, 337 Or 547 (2004) (describing trial court's award of monetary sanctions under ORCP 46 D for failure to produce documents). On this record, where there is evidence that the failure to previously produce the exhibits was intentional rather than mere oversight, the trial court was well

within its authority to exclude defendants' exhibits as a sanction for their discovery violation.

Defendants' final assignment of error, which pertains to the award of attorney fees, is contingent on their success as to one of the first three assignments. Because we reject each of defendants' predicate assignments of error, we reject their fourth assignment as well.

Affirmed.